PURSE SEINE INC., Plaintiff

v.

LUMANA'I DEVELOPMENT INC., and
BILL MAXEY, Defendants

High Court of American Samoa
Trial Division

CA No. 73-88

April 6, 1989

Before KRUSE, Chief Justice, AFUOLA, Associate
Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
 For Defendants, William A. Reardon

Facts

Plaintiff, a foreign corporation, is a
supplier of wire ropes and other items which it
primarily offers for sale in the territory to the
tuna fleet operating out of American Samoa. To
this end, plaintiff keeps an inventory on-island
which it initially kept in two shipping containers
stored in the yard of one of the canneries. In
time, plaintiff had to secure storage elsewhere and
decided to warehouse its goods with the defendant,
Lumana'i Development Inc., (hereinafter
"Lumana'i").

Negotiations between the parties were minimal
and never finalized. After initial contact (a
"quick preliminary discussion" according to Mr.
Greg Stewart testifying for plaintiff) in the month
of May 1984, plaintiff's inventory was, over a two
month period, gradually moved into Lumana'i's
warehouse and placed in common storage among items

1

belonging to others. As plaintiff would conclude a sale on a particular item, its local agent would be contacted to arrange the supply of that item from the warehouse. Lumana'i on the other hand was not concerned with keeping any sort of regular record on what plaintiff had coming in, going out, or indeed in storage at any given time.

In terms of consideration, plaintiff's representative, Stewart, referred merely to a certain dollar range --- $150 to $200 per month--- which would be offset by the value of plaintiff's two shipping containers which Lumana'i wanted to purchase. There was no indication from the evidence that a value for the containers was ever discussed nor anything that we can pinpoint to establish the relationship envisaged by the parties. As it happened, Lumana'i at first did not bill rent or storage fees and, in fact, this situation continued thereafter with the matter possibly forgotten.

Towards the end of May 1985, defendant Maxey took employment with Lumana'i as its General Manager. Mr. Maxey testified that his initial instructions were to reorganize the corporation's warehousing operations, which had accumulated a lot of stock in storage (some apparently left unclaimed) for which no fees were being generated. He found that corporate record keeping was marginal and that indeed certain bays had accumulated stock for which no one could account. Maxey testified that sometime in the following month, he attempted to get rid of a quantity of abandoned salt by offering the same to a certain tuna boat owner and, in the course of this, he also pointed out to the boat owner certain coils of wire rope on the premises. As a result, he concluded a single lot sale of some 6800 feet of rope at a price of $1.00 a foot. Mr. Maxey testified that the rope sold consisted of coils found stored inside as well as outside, and to the rear of, the warehouse. Mr. Maxey acknowledged that he had no background on pricing the rope. He added that he had difficulty persuading the boat owner to buy the rope which the latter regarded as being of inferior quality. The boat owner apparently dictated terms.

By September, 1985, Lumana'i had finally hired someone to look at cash flow and eventually the corporation sent out billings. In the process, plaintiff was billed for "warehouse space rental,"

2

discounted by an amount assigned by Lumana'i as the value of plaintiff's two shipping containers. The latter accepted and paid the billing, and a rental amount was thereafter regularly billed and paid on a monthly basis.

Sometime in the month of December, 1985, plaintiff discovered that some items reflected on its inventory records were not to be found in the warehouse. The missing items were four coils of wire rope: respectively 3000 feet, 1800 feet, 1200 feet, and 1800 feet, totalling some 7800 feet. The ropes varied in thickness and each coil was marked with an inventory identification number. Subsequent investigation by plaintiff's representatives led to the discovery of three of the coils on board a certain tuna boat from which they were later traced as having been sold by Mr. Maxey.

Mr. Stewart testified that he then confronted Paul Stevenson, a principal and director of Lumana'i, with the details of the investigation. Some discussion ensued about settling the matter and not involving the police. Mr. Stewart subsequently presented plaintiff's invoice in the amount of $15,600 for the four missing coils, priced at $2.00 a foot. The following day, the $6,800 which Mr. Maxey had received from his sale of rope was paid over to plaintiff and at plaintiff's insistence, Mr. Maxey signed a note (the "I.O.U."), which was also endorsed by Mr. Stevenson, acknowledging indebtedness to plaintiff in the sum of $8,800 payable in 12 monthly installments. Mr. Maxey made only one further payment to plaintiff in the amount of $750.00 and then decided that he was unduly coerced by plaintiff with threats of criminal action. Two years later, the matter has found its way to court.

### Conclusions

We naturally conclude on the evidence that there has been a conversion of plaintiff's property and that defendants are liable accordingly. As we have alluded to above, the relationship between the parties was never really clearly defined; however, our conclusion would be the same whether that relationship be viewed as a bailment or a lease. The contract between the parties (while coming into being in a rather untidy fashion) did at least envisage that in return for plaintiff's payment of

3

a fee, Lumana'i would keep in storage plaintiff's personal property delivered to its warehouse until plaintiff reclaimed the same. The uncontradicted evidence clearly shows that plaintiff sought to retrieve certain of its goods in storage; that plaintiff had accepted and paid storage fees billed (although rather tardily at first) by Lumana'i; and that goods sought by plaintiff had been sold by defendants without authority from plaintiff or the contract.

We also conclude, however, that the evidence only sustains a finding that Lumana'i had converted (sold) only three coils of the missing rope in total length of 6000 feet. A fourth coil of some 1800 feet was neither found nor accounted for on the evidence[1] (although plaintiff nonetheless billed Lumana'i $3,600 for this coil or $2.00 a foot). We are unable to conclude that defendants are liable to plaintiff under the rental/storage contract for the loss of this fourth coil of rope. The contract is far from clear that the relationship between the parties was one of bailment. We do not find a bailment and accordingly we need not be concerned with the question whether the appropriate duty of care expected of a bailee, was, in the circumstances, wanting on Lumana'i's part.

Additionally we find nothing on the evidence, short of speculation, to suggest that the loss of the unaccounted fourth coil (according to plaintiff's inventory records) might be attributable to defendants. All that we can gather from the evidence is that plaintiff's agents had just as much access to its inventory as did Lumana'i and it employees. At the same time, neither party particularly impressed us with being overly concerned in contractually detailing their respective rights as well as those obligations expected of the other, nor exhibited any concern to periodically cross check in case of loss.

---

[1]. According to plaintiff's records, the total length of its missing rope was 7800 feet. That is, 1000 feet in excess of the total sale concluded by Mr. Maxey. The coils recovered by plaintiff were respectively 3000 feet, 1800 feet, and 1200 feet, or a total of 6000 feet. Therefore, the additional 800 feet of rope sold by Maxey could not have belonged to plaintiff.

4

Plaintiff further claims that it nevertheless should recover the charge for the fourth coil based on that subsequent collateral contract with defendants made in consideration of plaintiff's forbearing suit. There is, at least arising from the complaint and the final arguments of counsel, a conflict as to what consideration plaintiff offered to support the collateral contract. Plaintiff argued that defendant promised to make regular instalment payments on the I.O.U. given in exchange for plaintiff's promise to forbear from bringing a civil suit for conversion. On the other hand defense counsel called it "extortion" under threats of criminal prosecution.

As a contract, the I.O.U. really tells us nothing about the nature of its consideration. On the testimony, however, the evidence preponderates in favor of the conclusion that defendants signed the note while concerned about avoiding any dealings with the police. Mr. Stewart testified that when he initially confronted Mr. Stevenson with the results of their investigation, the latter did not want police action. Mr. Stewart also stated that he was, at the time, aware of both criminal as well as civil options but that he wanted the matter settled amiably. He also testified that he did not really get into detailed negotiations with Mr. Stevenson, however he wrote out an invoice which Mr. Maxey later accepted without objection.

Mr. Maxey testified that he first met Mr. Stewart when the latter asked him about the missing rope. He said he was confused at the time in that all he had been told by the corporation was that some of the rope belonged to the corporation while some belonged to others who had not paid rent. He also stated that a few days later, he was told by Mr. Stewart to make restitution of the rope or the matter would be taken to the police. Mr. Maxey said that he talked to Mr. Stevenson about the matter and that no records could be located on the ropes. Being concerned that they had done something wrong, Mr. Maxey said he signed the note to repay in installments as he did not want police action.

We find that the defendants executed the I.O.U. in order to avoid criminal proceedings. In these circumstances, it is settled law that a promise to pay made on the premise that plaintiff

5

would forebear seeing the police is not enforceable. Bargains to "stifle a prosecution" including a bargain where a promise of compensation is given in exchange for a promise not to prosecute are unlawful and void as against public policy. 6A Corbin on Contracts § 1421, 17 Am. Jur. 2d Contracts § 200. This result arises regardless of the guilt or innocence of the party who allegedly committed the criminal act and regardless of the degree of the crime. 6A Corbin on Contracts § 1421; 17 Am. Jur. 2d, Contracts § 204. This rule is stated in a number of cases. "An agreement made in whole or in part 'to suppress an enquiry into the commission of an offense, or to prevent, in any measure, the administration of criminal justice' is void (citations omitted)." <u>Van Housen v. Monico</u>, 378 A.2d 609, 610 (Conn. App. 1976). "A release executed between private parties, the consideration of which, in whole or in part is the suppression of a criminal prosecution, is void." <u>Brown v. Best Products, Inc.</u>, 479 N.E.2d 852, 859 (Ohio 1985). "[A]n instrument given in consideration of suppressing a criminal prosecution is void as between the parties, without reference to the guilt or innocence of the threatened individual." <u>Wilson v. United States Lines</u>, 275 A.2d 457, 460 (N.J. Sup'r. Ct. 1971). We accordingly conclude that defendants are not liable to plaintiff for the missing fourth coil comprising 1800 feet of rope on the strength of the collateral contract.

Finally, copious documentary evidence was presented on plaintiff's costing methods which we have considered and conclude thereon that there was nothing untoward about the prices for the missing coils invoiced defendants. As noted above, defendants are liable to plaintiff for the value of the rope converted. That is, 6000 feet at $2.00 a foot equals $12,000.00. Deducting payments made of $6,800.00 on December 13, 1985, and $750.00 made by check dated February 19, 1986, the balance owing plaintiff is $4,450.00. Judgment will enter accordingly in favor of plaintiff in the sum of $4,450.00.

It is so Ordered.